**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

UNITED SOVEREIGN AMERICANS, INC.; RAMEY JOHNSON; and MICHAEL CAHOON
*Petitioners,*

v.

COLORADO SECRETARY OF STATE JENNA GRISWOLD, IN HER OFFICIAL CAPACITY;
PHIL WEISER, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF
COLORADO; COLORADO OFFICE OF ATTORNEY GENERAL; MERRICK GARLAND, IN
HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES; and THE
UNITED STATES DEPARTMENT OF JUSTICE

*Respondents.*

---

**PETITION FOR RELIEF IN THE FORM OF A WRIT OF *MANDAMUS* [1]**

---

*TO: The Honorable, the Judges of Said Court:*

United Sovereign Americans, Inc. is a Missouri nonprofit corporation; Ramey Johnson is

a Colorado resident and registered Colorado voter; Michael Cahoon is a Colorado resident and

registered Colorado voter.  Petitioners, by counsel, John S. Zakhem and Andrew C. Nickel, of the

law firm Campbell, Killin, Brittan, & Ray, hereby submit this Petition for Relief in the Form of a

Writ of *Mandamus*, directed to Respondents Jenna Griswold, in her official capacity as Colorado

Secretary of State, Phil Weiser, in his official capacity as Attorney General of Colorado, and

Merrick Garland, in his official capacity as Attorney General of the United States.

---

[1] Petitioners are cognizant of Federal Rule of Civil Procedure 81(b) which abolished mandamus actions in United
States District Court, but nonetheless authorizes "relief previously available through [writs of mandamus] by
appropriate action or motion under these rules." F.R.C.P. 81(b). Petitioners herein are seeking relief via the All Writs
Act (§ 1361) and an Action to Compel a United States Officer to Perform His/Her Duty (§ 1361).

*Respectfully Represents*:

### **Summary of Petitioners' Argument and Examples of Relief Requested**

1.      The Congress of the United States has outlined the minimum standards which must be maintained by every state in order for a federal election to be considered reliable.  As outlined below, in Colorado's 2022 federal election, those minimum standards were not met by State election officials rendering the certified election results that year unreliable.  Respondents in their official capacities have undertaken insufficient efforts to ensure that the 2022 performance is not repeated in subsequent federal elections, beginning in 2024.

2.      If the 2022 election performance is repeated in 2024, Petitioners and all Colorado voters will suffer damages.

3.      Apart from Court action in equity, no other mechanism exists in the law for Petitioners to require Respondents to perform their ministerial duties requiring that Colorado's federal elections be conducted in conformity with the law as Congress has set forth.

4.      Only this Honorable Court has the power to require Respondents to act to bring the 2024 (and subsequent) federal elections supervised by Colorado authorities into conformity with the minimum standards for reliability set down by Congress and outlined *infra*.

5.      Without the Court's action, Petitioners believe and therefore aver that the 2024 (and subsequent) Colorado federal election results will be unreliable in the same way, and thus unreliable for the same reasons, that the 2022 results are unreliable.

6.      Petitioners seek this Court's intervention to ensure that only properly registered voters cast votes in combined federal and state elections in Colorado beginning in 2024.

7.      Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and state elections in Colorado beginning in 2024.

8.     Petitioners seek this Court's intervention to ensure that all votes properly cast are counted *correctly* in combined federal and state elections in Colorado in even numbered years beginning in 2024.

9.     Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and state elections in Colorado elections beginning in 2024.

10.     Petitioners seek this Court's intervention to ensure that all voting systems are compliant with all critical infrastructure requirements and risk assessments are completed within the actual use context, thereby assuring that every ballot is correctly and uniformly processed, as well as accurately tabulated and secured in combined federal and state elections in Colorado beginning in 2024.

11.     Petitioners seek this Court's intervention to ensure that the authenticity of every ballot counted is proven by the maintenance of a comprehensive, unbroken chain of custody from the voter's hand to the final certified result, and the State election officials maintain records of said chain of custody post-election, in compliance with all legally prescribed safeguards in combined federal and state elections in Colorado beginning in 2024.

12.     Petitioners seek this Court's intervention to ensure that combined federal and state elections in Colorado in even numbered years beginning in 2024 are conducted with the transparency required by law.

13.     Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and state elections in Colorado beginning in 2024.

14.     Petitioners seek this Court's intervention clarifying and ordering that the currently accepted Federal definition "to certify" is *to attest that an official measurement is both accurate and the finding of accuracy was reached in a fully compliant manner*, thereby, directing that the

"certification of elections" by State election officials of combined federal and state elections in Colorado from 2024 onward constitutes an "attestation," ostensibly under penalty of perjury, by the certifying official(s), that the vote counts are accurate, and the cast and counted votes, and the election itself, were all conducted in compliance with applicable federal and state law.

15.     Petitioners, upon review of the statutes cited below, believe and therefore aver that federal and state law specifies what State officials must conform to, *at a minimum*, to properly conduct a combined federal and state election prior to certifying that election.

16.     Petitioners believe and therefore aver that based on the analysis below, combined with the various exhibits attached to this petition and incorporated by reference herein, that in the 2022 combined federal and state election, officials of the Colorado failed to ensure that **safeguards** were in place as mandated by various statutes designed to ensure the integrity of the elections.

17.     Petitioners believe and therefore aver that the failure by State election officials to know of and implement the safeguards required by law in 2022 allowed State election officials to certify that election despite analysis showing the election results were *per se* unreliable on account of apparent error rates exceeding those the law permits before the results in *any* federal election becomes unreliable.

18.     Petitioners believe and therefore aver that apparent error rates that exceed the maximum error rate allowed by law destroyed the integrity of the 2022 election making full confidence in the accuracy of that election impossible.

19.     While Petitioners cannot state with certainty that the 2022 Colorado General Election produced "winning" candidates who should not have won, Petitioners believe and therefore aver that Colorado officials cannot state with certainty that all "winning" candidates received more votes than their "losing" candidates because the election itself was compromised by

the State's failure to conform to the requirements of federal law designed to ensure reliable election results.

20.     Petitioners believe and therefore aver that Congress mandated the maximum number of election errors which were permissible in the 2022 combined federal and state elections in the State (and, indeed, in all states and voting territories).  An error rate above the maximum permissible rate set by Congress renders an election *uncertifiable* because such results are *per se* unreliable.  Nevertheless, State officials certified the 2022 election.

21.     Petitioners do not seek relief in this Court in a challenge to the outcome of the 2022 federal election in Colorado.  Petitioners agree that it is possible that in every federal contested election supervised and certified by the State in 2022 the "winner" received more votes than the "loser."

22.     Petitioners believe and therefore aver, however, that the certification by Colorado officials of the 2022 election was done despite the integrity of the election being suspect on account of *apparent* error rates occurring in that election that exceeded the error rate Congress permits before federal election results cannot be relied upon as accurate, and the State did nothing to investigate those apparent errors before certifying the election.

23.     Petitioners believe and therefore aver that it is reasonable to believe that systemic issues which occurred in the 2022 combined federal and state election in Colorado will continue uncorrected in 2024, 2026, 2028, and beyond, absent intervention by this Court.

24.     Petitioners believe and therefore aver that they have brought the various issues with the 2022 election to the attention of State officials, all of whom failed to take sufficient action to ensure no further repeats of those issues cited here affecting the integrity of the 2022 election.

25.     The relief requested by Petitioners in the form of a Writ of *Mandamus* seeks, broadly speaking, this Court order Respondents to perform the *ministerial* functions their jobs require by taking actions to rectify reliability issues evident in the 2022 election.[2]

### 2022 Combined Federal and State Election in Colorado
### Produced Unreliable Results and Should Not Have Been Certified

26.     In the Help America Vote Act ("HAVA"), 52 US.C.A. § 21083, Congress has mandated as follows: HAVA - voting system error rate "…(5) Error RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission ("FEC") which are in effect on the date of the enactment of this Act."

27.     Congress enacted HAVA and President Bush signed HAVA into law in 2002, and it remains the law of the United States to date.

28.     The voting standards of the FEC in effect at the time Congress enacted HAVA in 2002 were the Voting Systems Standards Volume I: Performance Standards (2002).[3]

29.     Those voting standards, in effect at the time HAVA became law, allowed for one error per 500,000 ballot *positions*.

30.     Petitioners believe and therefore aver that a federal election that exceeded an error rate of one error per 500,000 ballot *positions* renders a federal election unreliable under HAVA.

---

[2] Petitioners do not request this Court order Respondents to exercise their *discretion* or make *any* decision at all apart from enforcing the specific, non-discretionary, requirements of the law outlined, *inter alia,* below.

[3] As of 2021, there have been five iterations of national level voting system standards. The Federal Election Commission published the first two sets of federal standards in 1990 and 2002 (VSS1990 and VSS2002). The Election Assistance Commission then adopted Version 1.0 of the Voluntary Voting System Guidelines (VVSG 1.0, or VVSG2005) on December 13, 2005. On March 31, 2015, the EAC commissioners approved VVSG 1.1 (VVSG2015). On February 10, 2021, the EAC approved VVSG 2.0 (VVSG2021).

31.     As the HAVA provision enacted in 2002 cited above has not changed, the error rate of one error per 500,000 ballot *positions* is currently the law of the United States.

32.     A "ballot *position*" refers to the number of individual "choices" a voter could make on a single ballot.  For example, if a particular ballot has thirty little circles for the voter to fill-in or not fill-in, that single ballot would be said to contain thirty ballot *positions*.

33.     A voting *system* error occurs anytime the voting scanning machine should have discerned an error, not made by the voter, while counting one of those ballot positions on a scanned ballot.

34.     Experts working for the FEC estimated that 500,000 ballot *positions* equaled 125,000 *individual ballots*.[4]

35.     Petitioners believe and therefore aver that the FEC desired to clarify the meaning of 500,000 ballot *positions* in terms of how many individual ballots "make-up" 500,000 ballot *positions* in order to make easier understanding the election "error rates" permissible by HAVA, giving state election officials an easier metric with which to work in discerning how many errors at a maximum are permitted in any given election before that election becomes unreliable and, thus, uncertifiable.

36.     Petitioners believe and therefore aver that the calculation made by the FEC that 500,000 ballot positions represents 125,000 individual ballots is correct and constitutes a proper interpretation of federal law and Congressional intent under HAVA.

---

[4] (See Federal Election Commission Voluntary Voting System Guidelines of 2015, U.S. Federal Election Commission FEC. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf)

37.     In the 2022 Colorado General Election, 2,564,519 individual ballots were recorded by election officials as cast.  See

https://www.coloradosos.gov/pubs/elections/Results/Abstract/2022/general/turnout.html

38.     For the 2022 General Election, then, if 2,564,519 (ballots cast) is divided by 125,000 (because the law allows for one error per 125,000 ballots), that leaves twenty-one (21), rounded up, as the maximum number of errors permitted under federal law for the 2022 election. Only upon a showing of 21 or fewer errors, then, would HAVA permit State election officials to certify the 2022 election as valid.

39.     If there were more than twenty-one (21) voting system errors in the entire ballot tabulation for all ballots cast in the 2022 election in Colorado, the election results are unreliable.

40.     Colorado exceeded this benchmark of twenty-one (21) voting system errors in the 2022 General Election as outlined below.

41.     Petitioners believe and therefore aver that contributing to the unreliability of the State's 2022 election is the fact that Colorado's voter registration rolls, themselves, contained *hundreds of thousands* of *potential* errors at the time of the 2022 General Election.

42.     These potential errors were in the form of illegal duplicate registrations, voters with invalid or illogical voter history, voters placed in inactive statuses on questionable authority, backdated registrations, registrations with a modified date prior to registration, invalid or illogical registration dates, and age discrepant registrants.

43.     While Congress may not have specifically intended for these types of errors to be included in the one out of 500,000 error rate, Petitioners believe and therefore aver that this figure provides a general benchmark for what the Legislature considered an acceptable degree of error in our elections.

44.     Such errors jeopardize the validity of elections throughout the State, bring doubt as to the accuracy and integrity of the State's currently-in-place voting systems, undermine Coloradan's collective voting rights, all in violation of existing state and federal election laws.

45.     Petitioners seek redress from these voter registration apparent errors, relief from blatantly inaccurate voter registration rolls, relief from discrepancies between votes cast and actual votes reported, and relief from extreme voting errors generally, which collectively and historically amount to violations of federal election laws, Colorado election laws, and various voting rights encompassed by the United States Constitution.

46.     The aforesaid violations of federal and state law have in the past resulted in the certification of election results from provably flawed, inaccurate, and obscure processes outside the view of impartial witnesses or the public, and Respondents have refused collectively to maintain or enforce compliance with federal and state required transparency mandates.

47.     Petitioners have brought this issue to the attention of Respondents, who have done nothing to address these errors or ensure future elections will suffer from the same deficiencies.

48.     Furthermore, rather than be alarmed by these apparent errors pursuant to prevailing election laws, Respondents instead have collectively ignored the issue of the unreliable election results therefore produced.

49.     Petitioners believe and therefore aver that Respondents have failed to adequately police and monitor problems with the voter rolls and failed to adequately fix voting registration errors within the State, despite being in the best position to ensure the reliability, integrity, and accuracy of Colorado's elections to ensure veracity of the State's election results.

50.     Petitioners have repeatedly made good faith and sincere efforts to negotiate and convince Respondents to address these concerns.

51.     Petitioners have repeatedly shown Respondents evidence of potential violations of election law, regarding the conduct of elections by local and state officials charged with administering elections, on behalf of all citizens in accordance with the law.

52.     The risk of election subversion is indisputable, but the State has denied Petitioners a fair hearing, despite the serious nature of Petitioners' findings calling into question the reliability, integrity and accuracy of prior federal elections administered by the State.

53.     The prayer for relief seeks the protection of Petitioners' rights, as well as those of every voting citizen of the State, to have their vote fairly counted in an open and reliable election as such elections are defined according to law as outlined below.

54.     Respondents have denied Petitioners' members their right to a fair vote.

55.     Petitioners believe and therefore aver that Respondents have violated multiple federal and state laws, or negligently allowed such violations to occur.

56.     Respondents' collective actions in refusing to address the problem extinguish and undermine the very meaning of the right to vote in a fair representative democracy.

57.     Respondents can and should be compelled to address compliance with existing election law. Specifically: compelled to adequately investigate the issues, prosecute anyone in violation of federal and/or state law, and actively work to bring the State back into compliance with federal and state election law mandates so that Colorado's constitutionally enshrined voting rights are upheld and preserved.

58.     The All-Writs Act, 28 U.S.C. § 1651 provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

59. District Courts of the United States have original jurisdiction over any action in the nature of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

**Parties**

60. Petitioner United Sovereign Americans, Inc., is a nonprofit corporation incorporated in the state of Missouri.

61. Petitioner Ramey Johnson is a resident of the state of Colorado and a registered voter in Jefferson County, Colorado. Ms. Johnson has voted and intends to vote in the County. Ms. Johnson is the Republican candidate for Colorado State House District 30 in the 2024 General Election.

62. Petitioner Mike Cahoon is a resident of the state of Colorado and a registered voter in Douglas County, Colorado. Mr. Cahoon has voted and intends to vote in the County.

63. Respondent Jenna Griswold, in her Official Capacity as the Secretary of State of Colorado, is Colorado's chief State election official. 52 U.S.C. § 20509; COLO. REV. STAT. § 1-1-107(1)(d), (e). As chief State election official, Respondent Griswold is responsible for overseeing and managing the Office of the Secretary of State, which is a government agency tasked with supervising elections, maintaining statewide voter registration file, overseeing elections in Colorado, administering the Colorado Election Code and Voter Registration Laws, and ensuring compliance with state and federal election laws, including the Help America Vote Act and the National Voter Registration Act.

64. Phil Weiser, in his Official Capacity as the Attorney General of Colorado, is responsible for overseeing and managing the Office of the Attorney General of Colorado, which is a government agency tasked with the enforcement and prosecution of state law in addition to

ensuring that state actors, including those acting within the Colorado Secretary of State, are complying with Colorado law.

65.    Merrick Garland, in his Official Capacity as the Attorney General of the United States, is the chief law enforcement official of the United States, and is responsible for overseeing and managing the Department of Justice of the United States which is a government agency tasked with the enforcement and prosecution of federal law in addition to ensuring that state and federal actors, including those acting in the various states within the United States, are complying with Federal law.

## Jurisdiction and Venue

66.    This Court has jurisdiction pursuant to 28 U.S.C. § 1651.

67.    This Court has jurisdiction pursuant to 28 U.S.C. § 1361.

68.    This Court additionally has subject matter jurisdiction over this complaint because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

69.    This Court has personal jurisdiction as the Respondents are a collection of State of Colorado agencies and actors, and the State of Colorado is within the jurisdiction of the United States.

70.    "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gray v. Sanders*, 372 U.S. 368 (1963); *Gomillion v. Lightfoot*, 364 U.S. 347 (1960).

71.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

**Standing**

72.     Petitioners extracted data from Colorado's statewide voter registration database and uncovered numerous registration and voting violations. In particular, Petitioners discovered that for the 2022 election:

a.     7,390 votes were cast by voters with illegal duplicate registrations;

b.     4 votes were cast by voters an effective date before the registration date;

c.     58,324 votes were cast by voters whose first date of casting a vote was done before the date of their registration;

d.     20 votes were cast by voters who were registered as being older than 115 years old;

e.     820 votes were cast by voters who registered to vote on January 1 – which is a Federal holiday and a day when state offices are closed;

f.     10 votes were cast by voters with backdated registrations;

g.     63 votes were cast by voters who did not appear on the voter roll as of December 2022, but somehow nevertheless cast a ballot in November 2022;

h.     Between December 2022 and November 2023, 279 votes in the November 2022 election were added;

i.     Between December 2022 and November 2023, 35,112 votes in the 2022 Election were deleted.

73.     Petitioners have been and are currently harmed by the voting systems presently and formerly in use in Colorado's state and federal elections. Respondents have allowed, and continue to allow, violations of federal election laws, Colorado election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights.

74.     The violations of Colorado's election laws, federal election laws, the U.S. Constitution, and federal civil rights laws pertaining to voter registration rolls, transparency, compliance, and certification of the voting systems, and the serious issues hereinafter discussed with the overall voting systems exemplify Petitioners' injury.

75.     The injury to Petitioners and all Colorado voters would cease to exist, or be greatly relieved, if the Court grants Petitioners' requested relief.

76.     The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to independently satisfy the demands of Article III, provided those parties do not seek a distinct form of relief from the party with standing. *See Horne v. Flores*, 557 U.S. 433, 446-47 (2009) ("because the superintendent has standing, the Court need not consider whether the Legislators also have standing"); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 ("we have at least one individual plaintiff who has demonstrated standing…because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit").

77.     United Sovereign Americans is not seeking a distinct form of relief from the other Petitioners and therefore has standing.

## Background

### A.     THE CONSTITUTIONALLY PROTECTED RIGHT TO VOTE

78.     The United States Constitution grants the people the right to choose their representatives from among the people of the several states, according to the voting eligibility requirements of the state. U.S. Const. art. 1, § 2.

79.     The 14th Amendment of the United States Constitution, Section 1, defines a "citizen" as all people born or naturalized in the United States and subject to the jurisdiction thereof.

80.     The 14th Amendment of the United States Constitution, Section 2, protects eligible citizen voters against denial or abridgment of their vote.

81.     "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U. S. 137 (1803).

82.     Federal courts regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964).

83.     After the 2020 Presidential Election, pervasive discussion reported on by the media focused on the validity of the presidential election results within the State of Colorado.

84.     Discussions and/or litigation in Colorado, as well as in other states around the Nation, centered on whether raw vote totals were accurate, with particular attention focused on the question: if all ballots in dispute were decided, hypothetically, in the favor of one candidate for president over the other, would that have *changed the outcome* of the election in that state?

85.     That question concerned whether the recorded vote totals, viewed in the light most favorable to the losing candidate in any given state, *could* have affected the awarding of electoral votes from said state, which, in turn, *might* have affected the determination of the "winner" of the elections for president and vice-president in the Electoral College.

86.     The media widely reported that no court ruled that, even if all disputed ballots were assumed to have been found to be favorable to the Republican Candidate during the 2020

presidential election, the outcome in any disputed state would have been affected. Furthermore, there was insufficient evidence produced such that a court could find that the outcome of the election in any disputed state was unreliable.

87.     Petitioners do not seek to revisit the results of the 2020 presidential election, nor to re-examine the conclusions drawn by the various courts and media outlets as summarized above.

88.     Petitioners posit a different question than that noted above: ***How many disputed ballots found to be improperly cast in any given federal election may occur before the reliability and integrity of the entire election becomes suspect?***  Petitioners respectfully represent that Congress has answered this very question as outlined further below and Congress' answer to this question forms much of the basis of the instant Petition.

89.     In *In re: Coy*, 127 U.S. 731 (1888), the United States Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* has not been overturned and remains good law throughout the country. *See United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982).

90.     In *Oregon v. Mitchell*, the Supreme Court stated:

> The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right deeply embedded in the Constitution. Article I, § 2, provides that the House is composed of members 'chosen . . . by the People' and the electors 'shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.' The Seventeenth Amendment states that Senators shall be 'elected by the people.' The

Fifteenth Amendment speaks of the 'right of citizens of the United States to vote' -- not only in federal but in state elections.

* * *

[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. This 'right to choose, secured by the Constitution,' *United States v. Classic*, 313 U. S. 299, is a civil right of the highest order. Voting concerns 'political' matters; but the right is not 'political' in the constitutional sense. Interference with it has given rise to a long and consistent line of decisions by the Court; and the claim has always been upheld as justiciable.

*Oregon v. Mitchell*, 400 U.S. 112, 138-39 (1970).

91.     Justice Harlan also stated the following in his concurring opinion:

[A]s the right in the people of each State to a republican government to choose their Representatives in Congress is one of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by *Madison*, where treason might change a State government from a republican to a despotic government, and thereby deny suffrage to the people.

*Id*. at 185 (Harlan, J., concurring in part).

92.     The Supreme Court further stated: "we are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." *Reynolds v Sims*, 377 U.S. 533, 566 (1964).

93.     "Every voter in a federal...election...whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, *without its being distorted by fraudulently cast votes*." *Anderson v. United States,* 417 U.S. 211, 227 (1974) (emphasis added).

## B.     NATIONAL VOTER REGISTRATION ACT ("NVRA")

94.     The National Voter Registration Act ("NVRA") was passed for the purpose of ensuring accurate and current voter registration rolls to enhance the integrity of elections.

95.      In so doing, Congress found that: (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 US.C.A. § 20501.

96.      The NVRA exists in part to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 US.C.A. § 20501.

97.      The NVRA *requires* states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4).

98.      Similarly, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings related to state voter registration practices. 52 U.S.C. § 20508(a)(3).

99.      Federal regulations require states to provide data to the EAC for use in their reports, including the numbers of active voters, and the numbers of registered voters removed from the rolls for any reason. 11 C.F.R. § 9428.7(b)(1), (2), (5).

100.     The NVRA requires the States to complete any program the purpose of which is to remove ineligible voters from the official lists of eligible voters not later than ninety (90) days prior to an election.

101.     NVRA has two (2) methods of enforcement. First, the Attorney General can petition the court for declaratory and injunctive relief. Second, a private citizen can pursue a cause of action with certain requirements as follows: In a private action, notice is required, in that a

person must notify the chief election official of the State involved. If the violation is not corrected within 90 days of receipt of the notice or within 20 days after receipt of the notice, if the violation occurred within 120 days before the date of an election for office, the aggrieved person may bring a civil action in an appropriate district court seeking relief. In the alternative, if the violation occurs 30 days before the date of an election for federal office, no notice is required.  25 USC § 20510.

102.    Although the NVRA authorizes a private cause of action, as sought here, in the form of declaratory or injunctive relief, this "remedy" is largely toothless. Any Court in the United States would have great reluctance to formally order election officials to correct the NVRA error and/or decertify an election so close in time to an actual election or just after certification.

103.    Additionally, to what extent the NVRA requires a hypothetical plaintiff to have suffered injury is not clear – standing could be a troublesome burden to prove particularly if the harm, such as voter fraud and dilution, has been committed on a class people, the electors as a whole, rather than on an individual person.[5]

104.    Furthermore, a Court could attempt to use the doctrine of laches to avoid the distasteful task of questioning election officials, inquiring into potentially fraudulent elections, and inaccurate voting rolls, despite a hypothetical single plaintiff being in full compliance with the private NVRA notice requirements.

105.    Congress's power to pass the NVRA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voter rolls a

---

[5] Petitioners suggests it is unlikely Congress intended to require individual standing in cases where mass violations of the NVRA occur due to widespread errors.  Petitioners aver it is much more likely Congress intended organized groups of voters to bring private actions under such circumstances under an "organizational standing" theory.

requirement to uphold the general (as opposed to the individual) right of the people to choose their representatives.

106.    Petitioners seek to bring a private cause of action under NVRA.

**C.    HELP AMERICA VOTE ACT ("HAVA")**

107.    The Help America Vote Act ("HAVA") exists in part to "establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and other purposes." H.R. 3295 (2002).

108.    HAVA requires that *voter roll databases* contain only the registrations of qualified citizen voters residing in that state. 52 US.C.A. § 21083(a).

109.    HAVA defines a *voting system* as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and count votes; to report or display election results; and to maintain and produce any audit trail information." 52 US.C.A. § 21081(b).

110.    The purpose of any voting system is to accurately record, store, consolidate, and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

111.    Petitioners believe and therefore aver that the ability to "cast and count votes" begins with establishing eligibility and registering only qualified citizens into voter registration databases, thus assuring that all ballots granted, cast, and counted, are lawful.

112.    Petitioners believe and therefore aver that inaccurate voter rolls have significant negative consequences in elections.

113.    Per HAVA, in any given state, each qualified voter is granted a unique statewide identifier in a database, which averts the risk of double-voting or extra ballots being cast in the name of one individual voter.

114.    HAVA furthermore requires that federal elections adhere to an accuracy standard established by the FEC through Section 3.2.1 of its Voting System Standards (2002), which states in relevant part that error rates are "…*set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections*." United States (2002) *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (emphasis added).

115.    Accuracy in a voting system is defined as the ability of the system to capture the intent of voters without error. United States. (2002) *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

116.    Section 301 of HAVA regarding "Voting System Standards," states that the "error rate of [a] voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission." 52 US.C.A. § 21081(a)(5).

117.    Petitioners asks this court recall that, the FEC voting systems standards of section 3.2.1 establish that "the system shall achieve a target error rate of no more than **one in 10,000,000**

**ballot positions, with a maximum acceptable error rate in the test process of one in 500,000**

**ballot positions.**" See *supra*. at 30 (emphasis added).

118.    The Voluntary Voting System Guidelines ("VVSG"), Version 1.1, Section 4.1.1 –
Accuracy Requirements state, in part, **"[a]ll systems shall achieve a report total error rate of**
**no more than one in 125,000."** Furthermore, "[t]he benchmark of one in 125,000 is derived from
the 'maximum acceptable error rate' used as the lower test benchmark in the 2005 Voluntary
Voting System Guidelines Version 1.0. That benchmark was defined as a ballot position error rate
of one in 500,000. The benchmark of one in 125,000 is expressed in terms of votes, however, it is
consistent with the previous benchmark that the estimated ratio of votes to ballot positions is ¼."
United States (2015) *U.S. Election Assistance Commission.* United States [Web Archive]
Retrieved from the Election Assistance Commission,
https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf.[6]

119.    HAVA also requires that states who receive payments for the administration of
elections must use the funds "in a manner consistent with each of the laws described in Section
21145...and the proposed uses are not inconsistent with the requirements of Title III." 52 U.S.C. §
20971(c).

120.    Other courts have held that a private cause of action, as sought here, exists for
HAVA violations through 42 U.S.C. § 1983. *Colon-Marreror v. Velez*, 813 F.3d 1, 22 (1st Cir.
2016) (finding a private action under 1983 for HAVA violations because the provision provided
enforceable voting rights and imposes binding obligations on state officials).

---

[6] In the latest version of the VVSG, or VVSG 2.0, the EAC adopted the position that "the value of 10,000,000 ballot
positions is taken from VVSG 1.0 [VVSG2005]; however, it is used here as the minimum number of ballot positions
to test without error. *If a larger number of ballot positions is used, there still can be no error.*" (emphasis added).

121.    §1983 provides a mechanism for enforcing individual rights secured elsewhere as in rights independently secured by the Constitution and laws of the United States. *Gonzaga University v. Doe*, 536 U.S. 273 (2002). Importantly, a §1983 plaintiff must assert a violation of a federal right, not just a law. *Blessing v. Freestone,* 520 U.S. 329 (1997).

122.    The private cause of action pursuant to §1983, and sought here, can be found for violations of HAVA, which requires voting systems to provide the voter with the opportunity to change the ballot or correct any apparent error before the ballot is cast and counted. 52 USC 21081(a)(1)(A)(ii). Improper configuration of the voting machines by state election officials would constitute the violation.

123.    §1983 is currently the only mechanism where HAVA violations will receive any meaningful private review, yet it has proven thus far to be ineffectual at providing any real remedy for such violations.

124.    Congress' power to pass HAVA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voting systems a requirement to uphold the right of the people to choose their representatives.

## COLORADO ELECTION LAWS

125.    Per Colorado Revised Statutes, C.R.S. § 1-1-107, the Colorado Secretary of State is, among other things, required to do the following:

a.    To supervise the conduct of primary, general, congressional vacancy, and statewide ballot issue elections in this state;

b.    To enforce the provisions of the Colorado Election Code;

c.    With the assistance and advice of the attorney general, to make uniform interpretations of the Colorado Election Code;

d.    To serve as the chief state election official within the meaning of the federal "Help America Vote Act of 2002", 52 U.S.C. 20901 et seq., and, in that capacity, to coordinate the responsibilities of the state of Colorado under the federal act in accordance with the requirements of the Colorado election code.

C.R.S. § 1-1-107(a)-(e).

126.    Colorado law requires that the Colorado Secretary of State implement…a single, uniform, official, centralized, interactive, computerized statewide voter registration system defined, maintained, and administered at the state level.  C.R.S. § 1-2-301.

127.    The statewide voter registration system is commonly referred to as "SCORE". C.R.S. § 1-1-104(46.7).

128.    Per C.R.S. § 1-2-301, SCORE is required to do the following:

a.    Enable county clerk and recorders to maintain voter registration information;

b.    Remove the names of voters who are not registered or who are not eligible to vote from the statewide voter registration list;

c.    Remove duplicate names from the statewide voter registration list;

d.    Identify electors by name, place of residence, precinct number, date of birth, Colorado driver's license number, social security number, or other identification number, as such numbers may have been provided by the elector at the time the elector first registered to vote, and the date of registration.

129.    Colorado Statute requires voters to be eighteen years of age by the date of the next election, a citizen of the United States, and has resided in Colorado for twenty-two days immediately prior to the election.  C.R.S. § 1-2-101(a)-(b).

130.    Colorado Statute makes it a felony to knowingly give false information regarding the elector's place of present residence.  C.R.S. § 1-13-709.5.

131.    Colorado Statute also makes it a felony to vote in any election provided by law knowing that such person is not entitled to vote in such election.  C.R.S. § 1-13-704.5.

132.    Colorado statute makes it a misdemeanor for an election judge to willfully permit any person to vote who is not entitled to vote. C.R.S. § 1-13-704

133.    Colorado statute makes it a misdemeanor to falsely personate any elector and vote in any election under the name of such elector.  C.R.S. § 1-13-705.

134.    Petitioners believe and therefore aver that the State cannot demonstrate effective control over voter eligibility in conformity with federal or state requirements, and the State has implemented a system that does not guarantee accuracy or compliance with legal mandates requiring the State to ensure that only eligible voters may register and vote.

**D.    ELECTION FRAUD CONGRESS SOUGHT TO GUARD AGAINST**

135.    Petitioners do not accuse any person or entity of engaging in election fraud in 2022, nor propose any person or entity will engage in such fraud in 2024, nor in subsequent federal elections in Colorado.  Petitioners' purpose in describing types of voter fraud is to set forth the harms Congress sought to avoid by implementation of HAVA and NVRA as well as the various statutes passed by the Colorado General Assembly and cited above.

136.    Petitioners believe and therefore aver that election fraud can occur in multiple diverse ways, not all of which are individualized to a specific actor.

137.    Petitioners believe and therefore aver that over the past fifty years, Congress has enacted criminal laws with broad jurisdictional basis to combat false voter registrations, vote-

buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511.

138.    The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

139.    Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections, can constitute prosecutable election fraud. *See* 52 U.S.C. §§ 10307(c); 10307(e); 20511(2).

140.    It is *possible* for election officials acting "under color of law" to commit election fraud by performing acts such as diluting ballots with invalid ones (ballot stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in any election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511(2).[7]

141.    An individual commits election fraud by submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the fictious name to vote in federal elections. 52 U.S.C. §§ 10307(c), 20511(2).

---

[7] For purposes of the present Petition, Petitioners do not suggest any Colorado election official engaged in election fraud.  Rather, Petitioners point out the *possibility* of improper conduct by election officials as a harm against which Congress and the General Assembly have *sought* to guard by enacting the various statutes cited here.  A reason Congress, especially in HAVA, set forth standards that must be met before an election is considered reliable is to counter potential election fraud and to thus produce presumptively reliable election results.

142.     An individual commits election fraud by knowingly procuring eligibility to vote for federal office by people who are not entitled to vote under applicable state law and/or people who are not Citizens of The United States. 52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f).

143.     An individual who makes a false claim of United States' Citizenship to register to vote commits election fraud. 18 U.S.C. § 1015(f); 18 U.S.C. § 911.

144.     A person who provides false information concerning a person's name, address, or period of residence in a voting district to establish voting eligibility commits election fraud. 52 U.S.C. §§ 10307(c), 20511(2).

145.     Fraud can occur where an individual causes the production of voter registrations that qualify alleged voters to vote for federal candidates, where that individual knows the registrations are materially defective under applicable state law. 52 U.S.C. § 20511(2).

146.     However, election fraud need not involve the participation of individual voters. Election fraud can occur where an individual or organization places fictious names on voter rolls (allowing for fraudulent ballots which can later be used to stuff the ballot box, *supra*.), casting fake ballots in the names of people who did not vote, obtaining and marking absentee ballots without the input of the voter involved, and falsifying vote tallies.

147.     When the federal government seeks to maintain the integrity of elections, it does so for specific federal interests *inter alia*: (1) the protection of the voting rights of racial, ethnic, or language minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the

prevention of non-citizen and other voting by persons ineligible to vote under applicable state law.

Richard C. Pilger, *Federal Prosecution of Election Offenses*, p. 30, 8th Edition (2017).

148.    Congress has enacted a litany of specific crimes that can be prosecuted under a

general definition as "election fraud," including:

> a.    18 U.S.C. § 241 – Conspiracy Against Rights. *See United States v. Saylor*, 322 U.S. 385 (1944) (stuffing a ballot box with forged ballots); *United States v. Classic*, 313 U.S. 299 (1941) (preventing the official count of ballots in primary elections); *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988) (destroying ballots); *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972) (casting absentee ballots in elderly or handicapped peoples' names); *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952) (impersonating qualified voters); *United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003) (conspiracy need not be successful nor need there be an overt act).

> b.    18 U.S.C. § 242 – Deprivation of Rights under Color of Law. *See United States v. Price*, 383 U.S. 787 (1966) (acted jointly with state agents); *Williams v. United States*, 341 U.S. 97 (1951) (actions clothed under Color of State Law).

> c.    52 U.S.C. § 10307(c) – False Information in, and Payments for, Registering and Voting.[8]

> d.    52 U.S.C. § 10307(e) – Voting More than Once.

> e.    52 U.S.C. § 20511(2) – Fraudulent Registration or Voting.

> f.    18 U.S.C. § 1015(f) – False claims to Register or Vote.

> g.    18 U.S.C. § 1341 – "Cost-of-Election" theory.

> h.    52 U.S.C. § 20701 – Improper Retention of Federal Election Returns.

149.    In short, election fraud can constitute numerous different actions or inactions, and

federal and state governments of the United States have an interest in guarding the integrity of

elections, and ensuring election fraud is stopped, then prosecuted appropriately.

### Facts and Summary of the Issues

---

[8] "Section 10307(c) protects two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials." *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994).

150.     Petitioner United Sovereign Americans reviewed Colorado's voter registration data from the 2022 general election, including the data which contained millions of entries of voter registration information purportedly for Colorado's voters.

151.     Thereafter, Petitioner Cahoon, acting on behalf of Petitioners United Sovereign Americans performed a series of SQL database queries on the data to extrapolate and refine information about voter registrations in the State. *See* Exhibit "A" for a copy of the SQL Database Queries.

152.     Thereafter, Petitioner United Sovereign Americans thoroughly reviewed the results.

153.     United Sovereign Americans' SQL database queries revealed thousands of apparent voter registration errors in the State of Colorado. See *Infra.*

154.     The results from the SQL database queries allowed Petitioners to produce a "Scorecard" reflecting Colorado's voter registration data detailing the thousands of apparent errors contained within that registration data. *See* Exhibit "B" for a copy of United Sovereign American's Colorado 2022 General Election Validity Scorecard.

155.     In addition, the results from the SQL Database Queries of Colorado's voter registration data allowed Petitioners' experts to compile a General Election Validity Reconciliation. *See* Exhibit "C" for a copy of United Sovereign American's Colorado 2022 General Election Validity Reconciliation.

156.     According to the data provided to Petitioners, for the 2022 election, Colorado had 4,345,130 voter registrations.

A.     **VOTER REGISTRATION ROLL INACCURACY**

157.     Analysis by Petitioners of the official Colorado State Voter Registration Data for the 2022 election revealed that, out of 4,345,130 voter registrations, there was a total of **1,427,815** voter registration violations including:

13,586 illegal duplicates, where the same voter has multiple registrations.

12 voter registrations with an effective date before the registration date.

1,318 voter registrations done on January 1, a state holiday.

34,576 backdated registrations.

146 Registrations for voters older than 115-years-old.

1,068,177 voter registrations with a first-voted date prior to the registration date.

310,000 voter registrations that have not voted in at least two Federal Elections.

*See* Exhibit "B" for a copy of United Sovereign American's Colorado 2022 General Election Validity Scorecard.

158.     This data shows that in 2022 the voter rolls in Colorado were not accurate and current as required by NVRA, HAVA, nor in conformity with specific Colorado laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 U.S.C.A. § 21081; and C.R.S. § 1-1.5-101 et seq.

159.     Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 general election to have these issues corrected.

160.     Respondents have ignored Petitioners' concerns and based on information and belief, did so without any meaningful review, action, or response.

161.     Petitioners believe and therefore aver that Respondents intend to administer and ultimately certify Colorado's 2024 general election and subsequent federal elections (involving both state and federal contests) using the same inaccurate and flawed data and conditions.

### B.      VOTES FROM INELIGIBLE VOTERS

162.      Petitioners' analysis of the official Colorado State Voter Registration Data for the 2022 election revealed that, out of the votes cast in the 2022 general election, there were a total of 1,427,815 evident voting violations, and 100,693 *unique* votes impacted by apparent voting violations.[9] These violations were in the form of:

**7,386** Duplicates, where the same voter has multiple registrations.

**58,387** Vote history invalid or illogical.[10]

**834** Invalid or illogical registration dates.[11]

**20** Age discrepant registrants.[12]

**35,391** Registrants with altered votes after certification.

*See* Exhibit "B" for a copy of Petitioners United Sovereign American's Colorado 2022 General Election Validity Scorecard.

163.      Petitioners believe and therefore aver that this data shows that in 2022, the voter rolls in Colorado were not accurate and current as required by the NVRA, HAVA, and specific Colorado laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 US.C.A. § 21081; C.R.S. § 1-1.5-101 et seq.

164.      Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 general election to have these issues, and all issues raised below, addressed and remedied. Petitioners continued in 2024 to seek redress and repair for these egregious violations through democratic means.

---

[9] Some registered voters have more than one violation. The number of unique voters indicates how many individual registrations have apparent errors – whether it be one or multiple apparent errors.
[10] Voter cast ballot before registration date; voted before appearing in voter roll.
[11] Registration effective date predates date of registration; registered on Federal holiday; backdated registration
[12] Registrants older than the age of one hundred fifteen (115), the age of the oldest living person in America.

165.    Respondents have ignored or dismissed, and continue to ignore or dismiss, these concerns without apparent meaningful review, action, or response, and furthermore Petitioners believe and therefore aver Respondents intend to administer and certify Colorado's 2024 (and subsequent) general election(s) (involving both state and federal contests) under the same inaccurate and flawed conditions as that have utilized in 2022 in conducting Colorado's combined federal and state elections.

## C.    ERROR RATES IN 2022 COMPARED TO RATES PERMITTED BY FEDERAL LAW

166.    Colorado's voting systems are subject to the permissible error rates set forth by Congress in HAVA and further elucidated by the FEC Voting System Standards 3.2.1 and explained in the EAC's VVSG. *Supra*.

167.    The *maximum* number of apparent voting system errors permissible in counting votes in the 2022 Colorado General Election using the calculations set forth by the Federal Election Commission upon mandate by Congress was twenty-one (21) errors at most allowed. The total number of Unique Ballots impacted by voting system errors in the Colorado General Election, however, was 100,693 apparent errors. *See* Exhibit "B."

168.    Even accounting for the possibility that of the 100,693 apparent errors, many were not true errors, Petitioners believe and therefore aver that the State cannot reasonably demonstrate that the 2022 General Election had twenty-one (21) or fewer errors such that the election could be considered reliable for certification.

169.    Under HAVA, an error rate of no more than one in 125,000 is permissible before the results of the *entire election* becomes suspect, and the integrity and reliability of the election compromised.   As mentioned above, this figure is calculated by dividing the total number of Colorado votes in a given election by 125,000, to arrive at the number of permissible errors in any

given election in order to create the error rate of no more than one in 125,000 mandated by the VVSG and HAVA.

170.     For the 2022 General Election this is 2,564,519 (number of votes cast) divided by 125,000 leaves twenty-one (21) (rounded up) as the maximum errors permitted, meaning that in order for the election to be considered valid, there cannot have been more than 21 voting system apparent errors in the entire ballot tabulation for all ballots cast in that election in Colorado.

171.     However, in the 2022 Colorado General Election, the number of voting system apparent errors in counting ballots for the 2022 general election was 100,693, a figure dramatically exceeding the maximum allowable apparent error rate of twenty-one (21).

172.     Because the voting system apparent error rate for the 2022 Colorado General Election was far above the maximum allowable error rates, Petitioners believe and therefore aver that the reliability and credibility of the 2022 results are cast into doubt as a matter of law.

### VOTER-TO-VOTE DEFICIT

173.     The official canvas for the 2022 Colorado Election was 2,564,519 ballots cast yet the data shows there exist 2,532,092 total votes cast – a discrepancy of 32,427 votes. *See* Exhibit "B."

174.     This discrepancy can best be defined as a Voter-to-Vote deficit.

175.     Additionally, the official canvas for the 2022 Colorado Election was 2,564,519 votes (ballots counted) yet there exist only 2,529,607 *voters who actually voted* according to the data provided – a discrepancy of 34,912 votes that Colorado election officials cannot explain or account for—a number far in excess of twenty-one (21) and indisputably each constitutes an "error."

176.   Petitioners believe and therefore aver that the **34,912 more votes counted than voters who voted** means that either tabulators overcounted votes statewide, or there is an alternative source of the data discrepancy.[13]

**D.   COLORADO'S 2022 GENERAL ELECTION VALIDITY**

177.   For Colorado's 2022 General Election, out of the 4,345,130 total registrations, Petitioners believe and therefore aver that there were 2,877,741 *valid* registrations, 40,904 uncertain/illogical/invalid registrations, 1,116,485 registrations which violated election laws, and 310,000 "Deadwood" registrations.[14] *See* Exhibit "C."

178.   Petitioners believe and therefore aver that of the people holding the 2,877,741 valid registrations, 2,428,914 votes were counted in the 2022 General Election.

179.   Petitioners believe and therefore aver that of the identified 40,904 uncertain/illogical/invalid registrations, 35,201 **people voted** and had their votes counted in the 2022 General Election, each of which Colorado election officials should have confirmed eligibility to vote before counting that vote and Petitioners aver that they did not.

180.   Petitioners believe and therefore aver that of the total of the identified 1,116,485 registrations that violated election laws in one way or another, 65,492 people holding such registrations *cast votes that were counted* in the 2022 General Election, each of which Colorado election officials should have confirmed eligibility to vote before counting that vote and Petitioners aver did not.

---

[13] Petitioners accuse no one of engaging in fraud or deceit.  Petitioners merely point out the discrepancy, which could be due to unintentional tabulator error, some fraud of unknown origin, a combination of both, or even fraud by the tabulators themselves. The discrepancy occurred in 2022 for an unknown reason.  It is the deficit *itself*, regardless of the cause, which demonstrates an error rate in excess of that permitted by HAVA calling into question the integrity of the election.  Petitioners propose to ask this Court to order Respondents to ascertain why the deficit occurred in 2022, ensure that a similar deficit does not re-occur in 2024, and in all federal elections thereafter in the future.

[14] "Deadwood" is a concept dealing with election fraud and is defined as a fake voter registration record. These registrations could include a voter who is deceased, ineligible, moved, etc.

181.    Petitioners believe and therefore aver that while none of the 310,000 "Deadwood" registrations are listed as having voted in the 2022 General Election, those registrations exist, and thus unscrupulous persons *could* utilize them to fraudulently cast votes in future elections.

182.    Petitioners believe and therefore aver that the *registration* error rate in Colorado for the 2022 General Election was twenty-six percent (26%) of the total registrations on the State's voter rolls.  This figure is arrived at by taking 40,904 uncertain/illogical/invalid registrations, plus 1,116,485 registrations which violated election laws, as a percentage of 4,345,130 total registrations.

183.    Petitioners believe and therefore aver that the *vote*r system error rate in Colorado for the 2022 General Election was three **(3%)**, arrived at by taking 35,201 votes counted from uncertain/illogical/invalid registrations, plus 65,492 votes counted from illegal registrations, as a percentage of 2,529,607 votes cast.

184.    Per HAVA and the FEC, the legal standard of allowable registration errors for a federal election is 0.0008% (or 1 out of 125,000) yet the voter system error rate in Colorado's 2022 combined state and Federal General Election was 20%.

### **RELIEF REQUESTED**

### **FIRST CLAIM FOR RELIEF**
### **ALL WRITS ACT RELIEF – 28 U.S.C. § 1651**

185.    Petitioners incorporate the previous paragraphs by reference as if set forth at length here.

186.    Petitioners are not seeking to undermine official elections results previously certified.  Petitioners have cited issues in prior Colorado federal elections to add weight to Petitioners' belief that absent intervention by this Honorable Court, Respondents will permit the

same apparent errors to occur in the 2024 (and subsequent) General Election(s) in Colorado, and in all following federal elections in the State.

187.    Petitioners seek redress from the constitutional harm brought upon them, and the Colorado electorate at large, by Respondents' failure to comply with federal and state election law.

188.    Petitioners believe and therefore aver that Respondents have done nothing, or an inadequate job, to address the issues presented in this Petition – particularly to address the inaccurate and likely fraudulent voter rolls and voter systems used in federal elections conducted by state authorities.

189.    Respondents' inaction and/or failure to act compels Petitioners to ask the Court to issue a Writ of *Mandamus* requiring Respondents to comply with the two federal statutes at issue (the NVRA and the HAVA) along with the Colorado Election Code, C.R.S. § 1-1-101 et seq., while giving Respondents a reasonable time within which to bring Colorado into compliance in time for the 2024 General Election and all federal elections conducted by the State going forward, while providing relief to 2024 voters if, upon showing by Respondents, bringing the State into compliance in time is impossible.

190.    Specifically, Petitioners respectfully seek the Court order Respondents take steps, both short term and long term, to ensure the apparent errors made during the 2022 elections do not recur, and to bring the State into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes in the 2024 and subsequent federal general elections in Colorado.

191.    This Honorable Court is authorized to issue a writ of *mandamus* under "The All-Writs Act," 28 U.S.C. § 1651 granting the power to United States Federal Courts to "issue all

writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

192.    A writ of *mandamus* under 28 USC § 1651 is typically used to fill gaps in the law, and the Supreme Court has stated that The All-Writs Act is a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.'" *Harris v. Nelson*, 394 U.S. 286 (1969) (All Writs Act *mandamus* properly used to conduct factual inquiries).

193.    A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (*quoting Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law)).

194.    A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the Petitioners has established has a clear legal right to have the governmental agency or officials, in this case Respondents, perform.

195.    A federal court may use all auxiliary writs as aids when it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942) (writ of *habeas corpus* is available to the circuit courts of appeals).

196.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

197.    "*Mandamus* is employed to compel the performance, when refused, of a ministerial duty . . . [i]t also is employed to compel action, when refused, in matters involving

judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either." *Wilbur v. United States*, 281 U.S. 206, 218 (1930). *See also Decatur v. Paulding*, 39 U.S. 497, 514-17 (1840) (Secretary of the Navy's duty to approve of pensions was discretionary, and therefore, not ministerial); *Kendall v. United States*, 37 U.S. 524 (1838) (Postmaster General had a ministerial duty to make entries); *Work v. Rives*, 267 U.S. 175, 177 (1925).

198.    Instantly, Petitioners have no other remedy apart from a writ of *mandamus*.

199.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or appropriate in this matter because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Colorado election officials and/or federal officials bring the State into compliance with federal and state law, specifically HAVA, NVRA, and the Colorado Election Code, C.R.S. § 1-1-101 et seq., absent a specific, existing private cause of action Petitioners could assert that affords Petitioners relief.

200.    Petitioners believe and therefore aver and assert private causes of action to enforce federal and state law where Respondents have allowed, and continue to allow, violations of federal election laws, State election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems. 52 US.C.A. § 20501; 52 US.C.A. § 21083.

201.    Petitioners believe and therefore aver that the voter rolls within the State of Colorado are inaccurate, in violation of NVRA and HAVA. These are not list maintenance failures. The inaccuracies represent a failure to control the process of validating and registering

only qualified citizen voters. Persons possessing apparently invalid and/or illegal registrations voted in large numbers in Colorado's 2022 General Election.

202.    Petitioners believe and therefore aver that the Respondents have lost control of voter registration, leading to the distribution of ballots to what appear to be false registrants which results in a diluted vote to all voters including Petitioners, harming the electorate at large. The voter-to-vote deficit is illustrative here in that the official canvas for the 2022 Colorado Election was 2,564,519 votes counted when there exist 2,532,092 total ballots cast in the data – a discrepancy of 32,427 votes. Upholding HAVA includes the risk assessments and proper certification of all system elements individually, and the system as a whole.

203.    Petitioners believe and therefore aver that an election official's job is fidelity to the law in administering the electoral process, thereby protecting the integrity of an election, and the citizens from corruption in the election process.

204.    Petitioners believe and therefore aver that State officials' failure to follow the law has resulted in election outcomes that are untrustworthy. The voting system in its present form cannot be used to produce trustworthy and reliable results without the requested judicial intervention.

205.    Petitioners believe and therefore aver that a writ of *mandamus* is appropriate in this case. Respondents have failed, and continue to fail, in complying with federal and state laws regarding voting – including voting accuracy and accountability. It is clear from the Respondents conduct before, during, and after, the 2022 elections that, absent judicial action, despite notice, Respondents will do nothing to repair the deficiencies noted above to ensure the integrity of Colorado elections are conducted in compliance with federal and state law.

206.    The scope of Petitioners' *mandamus* request is narrow: Petitioners seek this Court to order Respondents to follow existing federal and state law designed by Congress and the Colorado legislature to ensure that Colorado's 2024 and subsequent combined federal and state general elections produce reliable results within the margin of error rate allowed.

207.    Petitioners hold up the mathematically unreliable analysis (according to, *inter alia*, HAVA) of the 2022 Colorado combined federal and state General Election as evidence that, should the writ not issue, the apparent error rate in the 2024 and subsequent combined general elections will continue to exceed the law's mandated maximum error rate permitted and continue to produce election results that are unreliable that should not be certified.

208.    Petitioners seek that the requested writ direct Respondents to investigate and remedy the issues exposed in the 2022 elections to avoid repeating the same mistakes in future combined federal and state general elections which are constitutionally administered by Colorado pursuant to Article I, Section 4 (delegating to the state legislatures the power to regulate federal elections for members of the House of Representatives, with Congress reserving the power to "…alter such Regulations [made by the various state legislatures]…"),[15] and, generally, Article II, Section 1 (granting state legislatures the power to determine how presidential electors are chosen) of the United States Constitution.[16]

---

[15] Petitioners aver that NVRA and HAVA are examples of Congress' exercising its power under Article I, Section 4 to "alter" Colorado's (and all other state's) otherwise absolute constitutional authority to regulate federal elections to the House of Representatives and, by application of the 17th Amendment to the U.S. Constitution providing for the direct election of two senators from each state, Congress may exercise its authority "…from time to time by Law make or alter such Regulations…" [of the various states…] to regulate the election of United States Senators as well the election of members of the House of Representatives.

[16] Petitioners include citation to Article II and the choosing of electors for president and vice-president, (later modified by the 12th Amendment), to again demonstrate the Framers' intent that the various states shall have presumptive authority to regulate and administer the election of all federal officers on the ballot for consideration in a federal election.  Article 1, Section 4 (as later amended) and Article II, Section 1 (as later amended) are examples of where the Framers intentionally intertwined the powers of the various states with those of Congress, while making certain Congress maintained the *ultimate* power to regulate the election of its members, the then-prevailing concepts of *Federalism* and *Dual Sovereignty* notwithstanding.

209.     Petitioners believe and therefore aver that since the Constitution reserves to Congress the *ultimate* (as opposed to the *presumptive*) power to regulate the means by which Congress' own members are chosen, while the Constitution simultaneously delegates the presumptive power to regulate such elections to, in this case, the legislature of the State of Colorado to further delegate as it sees fit to do so by law, the Respondents here, who are not federal officers *per se*, *become* federal officers by agency requiring them to carry out not only Colorado election law, but additionally to carry out federal election statutes passed by Congress and duly signed into law by the President under Congress' ultimate authority laid out in Article I, Section 4 of the Constitution.

210.     Petitioners believe and therefore aver that delegation of authority by the General Assembly of powers to supervise federal elections to any Respondent State officials pursuant to the General Assembly's power to regulate federal elections granted by Article I, Section 4, makes said State Respondents into federal officers by agency or quasi-federal officials in the conducting of their duties to regulate federal elections.

211.     Petitioners believe and therefore aver that ordinary principles of federalism and dual sovereignty where a federal district court judge would be reluctant to issue an order to a State official pertaining to how that state official may perform his/her official functions are inapplicable because the Respondent State official is acting in his/her hybrid role as a quasi-federal officer as required by Article I, Section 4.

212.     Petitioners believe and therefore aver, then, that this Honorable Court has authority to issue the requested writ of *mandamus* to compel, not just the Respondent Federal officers to ensure that federal election law is carried out in Colorado's 2024 and subsequent general elections, this Court also has the authority to compel Respondent State officials because

said officials are charged by the U.S. Constitution in the carrying out of federal law where Congress has asserted its power to "alter" existing Colorado federal election procedures as it did in enacting NVRA and HAVA.

213.    Petitioners believe and therefore aver that any delegation from the Colorado legislature to the Executive Branch of the Colorado government (e.g., to the Governor who in turn delegates power to the Secretary of State, or any delegation of the General Assembly's power to regulate federal elections to the Attorney General) still falls under this Court's authority which is derived through Article I, Section 4's grant to the various state legislatures of the power to supervise federal elections.

214.    Petitioners believe and therefore aver that simply because the state legislature may have chosen to delegate some of its authority to supervise federal elections to Respondent members of the State's Executive Branch of government, such delegation does not insulate such officials from the power of this Court, since this Court's power comes from its authority over the delegating entity, in this case the Colorado legislature.

## SECOND CLAIM FOR RELIEF
### ACTION TO COMPEL AN OFFICER OF THE UNITED STATES TO PERFORM HIS DUTY – 28 U.S.C. § 1361

215.    Petitioners incorporate the previous paragraphs as if set forth at length here.

216.    District Courts are empowered with the ability to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

217.    Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are parties responsible for the enforcement of federal election laws, specifically HAVA and NVRA.

218.    Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are officers, employees, or an agency of the United States.

219.    Petitioners believe and therefore aver that Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice, have done nothing, or, at best, an inadequate job at addressing the issues presented above – namely, the inaccurate and likely fraudulent voter rolls and systems within Colorado.

220.    The inaction and/or failure to act is harming Petitioners and the Colorado electorate at large warranting that the Court issue a Writ of *Mandamus* compelling Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice to enforce and police the two federal statutes at issue (NVRA and HAVA) for implementation in the Colorado 2024 General Election and subsequent combined federal and state elections administered by State officials and giving Respondents a reasonable period of time in which to do so.

221.    Specifically, the Court should order Respondents to take preventative measures to ensure that the errors evident the 2022 elections are not repeated in the 2024 and subsequent elections and bring the State into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes to ensure reliable election results as HAVA intended.

222.    A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (quoting *Cheney v. United States* Dist. Ct., 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law).

223.     A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the Petitioners has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

224.     A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

225.     Relief contemplated under statute providing that federal district courts shall have original jurisdiction of any action in nature of mandamus to compel an officer or employee of United States or any agency thereof to perform a duty owed to Petitioners is at least as broad as under common-law writ of *mandamus*. *Carey v. Local Bd. No. 2, Hartford, Conn.*, 297 F. Supp. 252 (D. Conn. 1969), aff'd, 412 F.2d 71 (2d Cir. 1969).

226.     Petitioners believe and therefore aver that they have no other remedy than a writ of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to Petitioners.

227.     Petitioners argue that injunctive and/or declaratory relief is inapplicable or inappropriate to its issues because the harm from the 2024 election is not yet realized and Petitioners is seeking to have Colorado election officials and/or federal officials bring the State into compliance with federal and state law using private causes of action, specifically under HAVA, NVRA, and the Colorado election code, absent other specific private causes of action that afford Petitioners relief.

228.     Petitioners believe and therefore aver that Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of

Justice have allowed, and will continue to allow, violations of federal election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems.

229.    Petitioners believe and therefore aver that the voter rolls within the State of Colorado are inaccurate, in violation of NVRA and HAVA. That these are not list maintenance failures. Instead, the inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. Persons voted in the Colorado 2022 General Election in significant numbers who held apparently invalid and/or illegal registrations that Colorado election officials, on information and belief, did nothing to verify.

230.    Petitioners believe and therefore aver that Respondents' failure to follow the law, or enforce the law, has resulted in election outcomes that are untrustworthy and unreliable. The State's voting system in its present form cannot be trusted to produce reliable results under HAVA, because Respondents will not follow the dictates of the Act necessitating this judicial intervention.

231.    A writ of *mandamus* against Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice is appropriate in this case. Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have failed, and continue to fail, in requiring the State of Colorado to comply with federal laws regarding voting – including voting accuracy and accountability as is clear from how the 2022 Colorado General Election was conducted.

232.    Petitioners believe and therefore aver that without judicial action, Respondents will do nothing to comply with HAVA and other federal and state statutes to ensure the integrity of Colorado's elections and the same issues that are evident from the 2022 General Election will call into question the validity of Colorado's 2024 and subsequent General Election results.

233.    The scope of this request for a writ of *mandamus* is narrow: Petitioners seek a judicial order requiring Respondents, both federal and state, to follow the laws cited herein in conducting the 2024 and subsequent federal elections, and adequately investigate and remedy the problems exposed in and 2022 elections and detailed above.

**WHEREFORE**,  Petitioners respectfully request Your Honorable Court:

(1) formally recognize Colorado's voter registration rolls contained thousands of apparent errors in the 2022 General Election;

(2) that these apparent errors took the form of illegal duplicate registrations, age discrepant registrants, registrations on a federal holiday, registrants whose voter history inexplicably changed, and registrants with registration dates altered backwards;

(3) enter an order in *mandamus* compelling Respondents to ministerially correct the apparent errors evident from the 2022 elections data, ascertain to the Court's satisfaction the reasons why the 2022 errors occurred, and prevent those same or similar ministerial errors from recurring during the Colorado 2024 General Election and all subsequent federal general elections to ensure the integrity of Colorado's combined federal and state elections going forward for years to come;

(4) pursuant to the NVRA and HAVA, order that the State of Colorado may not certify the 2024 General Election unless and until the relevant Respondents have demonstrated to the Court

that the 2024 General Election and subsequent elections were conducted in conformity with federal and state law and with fewer than the maximum errors permissible;

(5) order the state, and any subdivision thereof responsible for voter registrations, submit voter registration requests (and any existing registrations reasonably in question) to the Department of Homeland Security to verify the citizenship or immigration status of persons seeking registration to vote or who are presently on the state's voter rolls whenever there exist any reliable indicators that an applicant or registered voter may not be a U.S. citizen. (*see*: 8 U.S.C. secs.1644 & 1373(c)); and

(6) enter an order in *mandamus* requiring all public officials named as Respondents perform their duties as the law intended whether it be conducting federal elections in conformity with the law or investigating, and where warranted in their discretion, prosecuting persons or entities for failing to perform their duties in conformity to the law after being given timely notice to do so.

Respectfully Submitted on September 10, 2024,

**van der Veen, Hartshorn, Levin, & Lindheim**

By: /s/ Bruce L. Castor, Jr.
Bruce Castor
1219 Spruce Street
Philadelphia, PA 19107
Main: (215) 546-1000
Fax: (215) 546-8529
Email: bcastor@mtvlaw.com
Email: mtv@mtvlaw.com

**Campbell Killin Brittan & Ray**

By: */s/ John S. Zakhem*
John S. Zakhem
Andrew C. Nickel
Attorney for Petitioners
270 Saint Paul Street

Suite 200
Denver, CO 80206
Main: (303) 322-3400
Fax: (303) 322-5800
Email: jzakhem@ckbrlaw.com;
anickel@ckbrlaw.com